# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:10–cr-03160-RB** |
| | ) | |
| | ) | |
| **MARIO WASHINGTON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant Mario Washington's Motion to Suppress Evidence. (Doc. 44.) Defendant Washington argues that his seizure, arrest, and custodial interrogation by law enforcement officers for suspicion of drug smuggling on August 24, 2010 was unlawful and violated the Fourth and Fifth Amendments of the United States Constitution. Accordingly, Mr. Washington requests that the Court suppress any statements made by Defendant to law enforcement officers, any evidence seized from the motel room, including a cell phone that was found under the sink in the motel room during a later search, any evidence seized from Defendant's automobile, and any evidence seized from Defendant's person as a result of the unlawful arrest.

Having held a hearing on the matter, considered the parties memoranda, reviewed the relevant case law, and otherwise being fully informed, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion to Suppress. The Court suppresses the receipt and any other evidence seized during the search of Defendant's motel room and person incident to arrest, but does not suppress the cell phone, as it was no longer subject to an expectation of privacy at the time of the

seizure and was discovered through independent means. Next, the Court denies as moot Defendant's request to suppress evidence seized from the Dodge Charger because the government does not seek to admit this evidence. Similarly, the Court denies as moot Defendant's request to suppress his statements because the government does not seek to admit them at trial.

## I.      PROCEDURAL BACKGROUND

An indictment in this case issued on November 18, 2010 charging Defendants Alicia Unger, Mario Washington, and Michael Martin with one count of conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846, and one count of possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(D) and 18 U.S.C. § 2. (Doc. 30.) On December 29, 2010, Defendant Michael Martin pled guilty to the indictment charges. (Doc. 53.) On February 22, 2011, Defendant Alicia Unger also pled guilty to the indictment charges. (Doc. 88.) Accordingly, Defendant Mario Washington is the only Defendant who intends to go to trial in this case. In anticipation of trial, Defendant Washington filed a Motion to Suppress Evidence on December 15, 2010. (Doc. 44.) A motion hearing was held on February 23, 2011 before the Honorable Michael J. Reagan, United States District Judge for the Southern District of Illinois, on inter-circuit assignment in Las Cruces, New Mexico. A jury trial is scheduled for March 15, 2011 before the Honorable Hayden Head, Senior United States District Judge of the Southern District of Texas, who will also be in Las Cruces, New Mexico on inter-circuit assignment.

## II.     FINDINGS OF FACT

Based on the testimony presented at the suppression hearing, the Court made the following findings of fact:[1]

In the early morning hours of August 24, 2010, Border Patrol Agent Pablo Fernandez was

---

[1]. A transcript of the hearing is available through CM/ECF, Doc. 97.

patrolling a section of Highway 26 between Deming, New Mexico and Interstate 25. (Tr. 4–6.) This section of Highway 26 is a known drug smuggling corridor as it allows smugglers to avoid the United States Border Patrol checkpoint located just north of Las Cruces, New Mexico on Interstate 25. (Tr. 7.)  At approximately 1:49 a.m., Agent Fernandez was parked and observing traffic at mile marker 42 when he noticed two vehicles pass his location traveling less than a car length apart. (Tr. 9–10, 21.)  The first vehicle was a blue Dodge Charger, and the second vehicle was a dark blue Chrysler Sebring. (Tr. 10.)  Based on his experience as a Border Patrol agent, Agent Fernandez found this behavior suspicious, as vehicles traveling in this manner are often conducting smuggling activities. (Tr. 11.)   Accordingly, Agent Fernandez decided to follow the vehicles. (Tr. 11.)

After he caught up to the vehicles, Agent Fernandez performed a "radio check":  this means that he called dispatch with the license plate numbers, and asked for the cars' registration, a stolen-vehicle report, and a 72-hour lane check. (Tr. 12.)  For the Chrysler Sebring, the trailing vehicle, which had a Texas license plate, all three of these checks came back negative, "no records found," meaning that the car was not listed as registered in the database, that it had not been reported stolen, and that it had not passed through a U.S. port of entry in the last 72 hours. (Tr. 12–13.)  The fact that the registration check came back negative indicated that the car either had not been registered yet, or that the plate had been stolen and was not registered. (Tr. 12.)  Agent Fernandez then got in between the two vehicles to run the plate on the Dodge Charger, the leading vehicle. (Tr. 12–13.)  The Charger had an Iowa license plate and came back as registered to a woman with the last name of Washington. (Tr. 13–14.)

While he was performing the "radio check," Agent Fernandez observed that the vehicles were varying their speeds from between 50 and 70 miles per hour, as if they were trying to get Agent

3

Fernandez to pass them. (Tr. 14.)  Agent Fernandez continued to follow the vehicles as they arrived

in Hatch, New Mexico, and then continued through the city to Interstate 25. (Tr. 14–15.)  As the

vehicles approached the on-ramp for I-25, the Dodge Charger sped up considerably, while at the

same time, the Sebring slowed way down. (Tr. 16.)  In fact, the Sebring slowed down to almost

5 miles per hour on the on-ramp, and once it had entered the interstate, it was only going about

25 miles per hour in a 75 miles per hour speed zone. (Tr. 16–17.)

By the time they entered the interstate, Agent Fernandez had completely lost sight of the

Dodge Charger, and he decided to stop the Sebring. (Tr. 18.)  This occurred at mile marker 43 on

Interstate 25, approximately two miles north of Hatch. (Tr. 23.)  When he approached the vehicle,

Agent Fernandez observed a young lady sitting in the driver's seat of the vehicle; she was the only

occupant. (Tr. 18–19.)  Agent Fernandez asked for her license and registration and identified the

young woman as Alicia Unger, a U.S. citizen; he also learned that the car was lawfully registered

to Ms. Unger's husband. (Tr. 18–19.)

When asked her destination, Ms. Unger indicated that she was traveling to San Antonio,

Texas. (Tr. 19.)  Agent Fernandez found this suspicious, however, because she was going in the

wrong direction: in order to get to San Antonio, she should have stayed on Interstate 10 headed

eastbound, instead of getting on Highway 26 in Deming, New Mexico, which took her north toward

Albuquerque and circumvented the Border Patrol checkpoint on I-25. (Tr. 19–20.)  When Agent

Fernandez indicated to Ms. Unger that she was headed in the wrong direction, she nervously replied

that she was going to Illinois first to visit her mother, who was on her deathbed. (Tr. 20.)  Agent

Fernandez also noticed that Ms. Unger's bottom lip and hands were trembling. (Tr. 20.)  Based on

everything he had observed up to this point, Agent Fernandez was highly suspicious that Ms. Unger

was engaged in illegal smuggling activity, and he asked for permission to run a canine around the

4

vehicle. (Tr. 21.)

At approximately 2:07 a.m., Agent Vazquez, a canine handler with Border Patrol, and his dog arrived at the location. (Tr. 21.)  The agents performed an exterior sniff of the vehicle, and the dog alerted to the trunk area. (Tr. 22.)  Agent Fernandez then performed a search of the vehicle and discovered a large, black duffle bag in the trunk containing three bundles of marijuana wrapped in green plastic and weighing approximately 42 pounds. (Tr. 22.)  After this discovery, Ms. Unger and her vehicle were transported to the U.S. Border Patrol checkpoint south of Hatch, which is at mile marker 26 on Interstate 25. (Tr. 23.)   Upon their arrival at the Border Patrol checkpoint, at approximately 2:45 a.m., they contacted Agent Contreras, an officer with the Doña Ana County Sheriff's Department and a member of the Drug Enforcement Agency Task Force in Las Cruces, New Mexico. (Tr. 24 & 35–36.)  Agent Contreras drove from Las Cruces to the Border Patrol checkpoint on Interstate 25, arriving at the checkpoint around 4:00 a.m. (Tr. 37.)  When he arrived, Agent Contreras went to the detention area where they were holding Ms. Unger, confirmed with her that she had waived her rights, and began interviewing her. (Tr. 38.)

Initially, Ms. Unger denied knowing anything about the marijuana in the trunk of her car. (Tr. 38.)  During the traffic stop, at about 2:17 a.m., however, the agents had observed her sending a text message to someone. (Tr. 24, 38.)  The message read, "goin to jail. I got this." (Tr. 38.)  Agent Contreras confronted Ms. Unger with the message from her phone, and she began to cry and said, "You know. I'm going to get hurt.  I'm going to get hurt." (Tr. 38–39.)  Ms. Unger then indicated that the marijuana was not hers, but that she was transporting it from Arizona to Galesburg, Illinois for her boyfriend, Defendant Mario Washington. (Tr. 39, 42.)  Ms. Unger further indicated that Mr. Washington was in the blue Dodge Charger she had been following. (Tr. 39, 42.)

At about the same time, Border Patrol agents in Truth or Consequences notified Agent

5

Contreras that a blue Dodge Charger with Iowa license plates had been located in a motel parking lot in Truth or Consequences, New Mexico, which is north of the Border Patrol checkpoint, consistent with the direction the Dodge Charger had been traveling. (Tr. 39, 42.)  Agent Contreras instructed the Border Patrol agents in Truth or Consequences to make contact with the vehicle's occupants at the motel and to detain them for further investigation. (Tr. 42.)  Agent Contreras then continued the interview with Ms. Unger. (Tr. 42.)

Ms. Unger told Agent Contreras that she was scared of her boyfriend, Mr. Washington, and indicated that he had been violent with her in the past. (Tr. 42.)  Pulling back her hair, Ms. Unger revealed a scar at the top of her forehead that she had received when Mr. Washington "pistol whipped" her. (Tr. 42.)  Ms. Unger indicated that she had not reported the incident to the police because she was scared for her life. (Tr. 42.)  Ms. Unger also provided a physical description of Mr. Washington and Mr. Martin and of the clothes that they had been wearing. (Tr. 43.)  This description was relayed to the Border Patrol agents in Truth or Consequences. (Tr. 43.)  Agent Contreras then contacted his partner, Agent Gimler, also a DEA Task Force member, at approximately 4:30 a.m., briefed him on what he had learned from Ms. Unger, and instructed him to go to the motel in Truth or Consequences to assist the Border Patrol agents. (Tr. 43, 98.)

Border Patrol Agent Mechem of Truth or Consequences, New Mexico testified that he and Agent Tolhurst were contacted by the Las Cruces DEA and Border Patrol agents in the early morning hours of August 24, 2010 and instructed to be on the lookout for and to detain a blue Dodge Charger with Iowa license plates if they encountered it. (Tr. 69, 87.)  After conducting a search of the highways around Truth or Consequences for the Dodge Charger, the Border Patrol agents decided to check some of the motels in the area.  Agent Mechem got off Interstate 25 at exit 75, which is the first exit for Truth or Consequences if one is headed northbound on Interstate 25 from

6

Hatch, and he stopped at the Rio Grande Motel, located approximately 100 yards from the exit. (Tr. 71–72.)  When Agent Mechem entered the motel parking lot at approximately 3:30 a.m., he observed a blue Dodge Charger with an Iowa license plate. (Tr. 72.)  Agent Mechem requested a registration check, a stolen vehicle check, and a 72-hour lane check. (Tr. 72.) The operator informed him that this particular tag had already been ran that night by a Las Cruces agent, which indicated to Agent Mechem with a high degree of certainty that this was the automobile they were looking for. (Tr. 72–73.)

At this point, Agent Mechem went to a Chevron gas station that was immediately in front of the motel and called Agent Tolhurst, who was in charge that evening, and Agent Gutierrez, the narcotics dog handler. (Tr. 71, 73.)  When Agent Gutierrez arrived, the agents ran his dog through the parking lot of the motel to see if he alerted to any of the vehicles.  He did not alert. (Tr. 74.) Agent Mechem and Tolhurst were then ordered by the Las Cruces agents to knock on the door in front of the blue Dodge Charger to attempt to make contact with the Defendants. (Tr. 76, 87, 95.) The agents knocked on this door for approximately three minutes, at the same time announcing, "United States Border Patrol," but there was no answer. (Tr. 76.)  With no answer at this room, the agents contacted the office manager, who informed them that Mr. Washington and Mr. Martin were in Room 41. (Id. at 77.)  The officer manager offered them the key to enter the room, but the agents declined, preferring instead to knock on the door and wait for Defendants to answer. (Tr. 76.)

At approximately 4:20 a.m., Agent Mechem knocked on the door of Defendant's room, announcing "United States Border Patrol." (Tr. 50, 78.)  Agent Mechem then requested, "Can you come to the door, please?" (Tr. 78.)  The window to the motel room was open about four inches, and the agents could hear movement inside of the room. (Tr. 78.)  After approximately five minutes, Mr. Martin opened the door. (Tr. 79.)  When asked by the government about the possibility that

7

Defendants may have been destroying evidence, Agent Mechem stated,

> Yes, definitely.  I think there was time even before we knocked on that door.
> Because it's a small hotel and their window was open and I knocked on the other
> door and I said, "United States Border Patrol" when I was at the other door.  So if
> they would have heard that, you know, it would have given them ample time.

(Tr. 79.)  At no time during his testimony did Agent Mechem state that Agent Contreras informed

him that he was concerned about the destruction of evidence, safety concerns, or flight.

Additionally, at no time during his testimony did Agent Mechem indicate that his actions were

personally motivated by a concern for destruction of evidence, safety concerns, or flight.  Agent

Mechem merely stated that he seized the Defendants because he understood Mr. Washington had

been implicated in a crime and the Las Cruces agents ordered him to do so. (Tr. 76, 87.)

Additionally, at no time were there any efforts by any of the agents to obtain a warrant for the

suspects' arrest or to search the motel room. (Tr. 62, 106.)

After about five minutes of knocking and identifying themselves as Border Patrol agents,

Mr. Martin finally answered the door. (Tr. 80.)  Agent Mechem asked him, "Is this vehicle yours?"

(Tr. 80.)  Mr. Martin initially responded that he did not have a vehicle, but had walked to the motel;

however, after further questioning, Mr. Martin admitted that the car belonged to his cousin,

Mr. Washington. (Tr. 80.)  The agents then requested that Mr. Washington step out of the room as

well. (Tr. 80–81.)  The agents informed Mr. Washington that he was being detained and that he

could not go back into his room or leave the area. (Tr. 90–91.)  The agents did not frisk or search

Mr. Martin or Mr. Washington for weapons; however, they did ask that they keep their hands where

they could see them and not go anywhere where they could grab something. (Tr. 81.)  Additionally,

Agent Mechem performed a brief search of the motel room for any weapons or other contraband in

plain view that Mr. Washington or Mr. Martin could grab. (Tr. 82.)  Mr. Washington was very upset

8

about what he considered to be an unlawful detention, and for this reason, Agent Mechem was concerned that he might become violent toward the agents and thought it prudent to perform a brief search of the motel room for officer safety. (Tr. 83, 90.)  Agent Mechem did not indicate, however, that he was concerned about officer safety prior to making the seizure.

About one hour later, at 5:30 a.m., Agent Gimler arrived to take Mr. Martin and Mr. Washington back to the DEA Office in Las Cruces.  (Tr. 83, 85, 98.)  At this point, Agent Mechem read Mr. Washington his Miranda rights. (Tr. 83.)  Once in Las Cruces, Mr. Martin and Mr. Washington were processed prior to being placed in holding cells. (Tr. 99–100.)  During the processing, they were asked to empty their pockets so that the contents could be inventoried; Mr. Washington had some change and wadded up receipts in his pockets. (Tr. 100.)  The change was noted on an inventory sheet, and Mr. Washington threw the receipts in the trash. (Tr. 100.)  Agent Gimler removed the receipts from the trash and found that one was from a Walmart store in Tucson, Arizona for the purchase of several large plastic bags and a vacuum cleaner. (Tr. 101.)  The bags were the type commonly advertised for clothing storage, where a vacuum cleaner can be used to suck out the air. (Tr. 107–08.)  The agents contacted the Walmart and obtained a video from the store of Mr. Washington purchasing the items. (Tr. 101.)  The agents later confirmed that these were the same kind of bags in which the marijuana that was seized had been packaged. (Tr. 101, 107–08.)

After Mr. Washington and Mr. Martin were taken to Las Cruces for processing by Agent Gimler, Agent Mechem performed a search of the motel room in Truth or Consequences. (Tr. 85.) Agent Mechem found some marijuana residue around the toilet and an empty package of Swisher Sweets cigars in the garbage can that had an odor of marijuana. (Tr. 86.)  A second search of the motel room was also conducted later that afternoon by Agents Contreras and Gimler.  Agent Contreras had been attempting to find the phone to which Ms. Unger texted, "goin to jail.  I got

9

this." (Tr. 54.)  Mr. Washington had a phone on him when he was processed, and Agent Contreras called the number to which Ms. Unger had sent the text; however, the phone Mr. Washington was carrying did not ring. (Tr. 53–54.)  Agent Contreras then contacted Sprint to get a GPS fix on the missing phone. (Tr. 54.)  With a GPS transponder and the coordinates provided by the phone company, the Border Patrol agents were able to zero in on a countertop in the bathroom area of the motel room. (Tr. 54, 108–09.)  The agents then located the phone underneath the countertop, in a crevice near the wall at about 1:30 p.m. in the afternoon on August 24, 2010. (Tr. 54, 106.)  The checkout time for the motel was 11:00 a.m. on August 24, 2010. (Tr. 50.)

## III.   ANALYSIS

### A.   Government Only Seeks to Admit Cell Phone and Walmart Receipt

Defendant Washington argues that his seizure, arrest, and custodial interrogation by officers for suspicion of drug smuggling at his motel room in Truth or Consequences, New Mexico on August 24, 2010 was unlawful and violated his rights protected by the Fourth and Fifth Amendments to the United States Constitution.  Accordingly, Mr. Washington requests that the Court suppress any statements made by Defendant to law enforcement officers at the time of the unlawful seizure, any evidence seized during the agents' search of the motel room, including a cell phone that was found under the sink, any evidence seized from Defendant's automobile, and any evidence seized from Defendant's person. (Doc. 44.)  The government, however, has stated that it does not intend to introduce in its case-in-chief any statements that Defendant made to the Border Patrol agents, any evidence seized from Defendant's Dodge Charger, or any evidence seized from the motel room, except for the cell phone. (Doc. 71 at 9.)  Thus, Defendant's request that the Court suppress any statements made to the agents under the Fifth Amendment due to the fact that he did not receive his Miranda warnings prior to his arrest and interrogation at the motel room is moot, as is Defendant's

10

request that the Court suppress the evidence seized from the Dodge Charger.

**B.    Seizure of Defendant in Motel Room Unlawful**

In its Response to Defendant Mario Washington's Motion to Suppress, the government states that it "does not dispute that the defendant was effectively arrested at the time that the Border Patrol Agents knocked on the door to his motel room, yelled for the occupants of the room to open the door, and then directed that the defendant and Mr. Martin exit the room." (Doc. 71 at 10.)  At the motion hearing in this matter, the government reiterated this stance. (Tr. 116–17.)  To perform an arrest of a suspect in his or her motel room, officer's must generally possess a warrant, unless they have probable cause to arrest the suspect, plus exigent circumstances which justify an immediate entry. *Payton v. New York*, 445 U.S. 573, 590 (1980); *United States v. Reeves*, 524 F.3d 1161 (10th Cir. 2008).  Therefore, to determine whether there seizure was lawful, the Court must consider (1) whether the agents had probable cause to arrest Defendant, and if they did, (2) whether there existed exigent circumstances to enter the motel room without waiting for a warrant.

With regard to the first issue, the Court concludes that the agents had probable cause to arrest Mr. Washington.  "Probable cause exists where the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Maher*, 919 F.2d 1482, 1485 (10th Cir. 1990) (internal citation omitted).  The large quantity of marijuana found in Ms. Unger's vehicle, the fact that Mr. Washington was traveling in tandem with Ms. Unger, Ms. Unger's statement that she was transporting the marijuana for Mr. Washington and Mr. Martin, and the text message stating, "goin to jail. I got this," were sufficient facts for a person of reasonable caution to conclude that Mr. Washington and Mr. Martin had assisted and conspired with Ms. Unger to transport the large quantity of marijuana that was

11

discovered in the trunk of her vehicle.

With regard to the second issue, the Court concludes that the officers did not have the requisite exigent circumstances necessary to enter Defendant's motel room. The government argues that the agents had exigent circumstances to enter the motel room because (1) Mr. Washington had a history of violence with firearms towards Ms. Unger, and he could present a threat to the officers or public if they waited to arrest him; (2) he might destroy evidence before the officers made contact with him; and (3) there was a possibility he might flee the motel room. (Doc. 94 at 1–6; Tr. 117–18.) The burden is on the government to establish exigency. *United States v. Wicks*, 995 F.2d 964, 970 (10th Cir. 1993). "In general, . . . warrantless searches are permissible when police have a reasonable belief that exigent circumstances require immediate action and there is no time to obtain a warrant." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005). In determining whether the government has met its burden, the Court must keep in mind "the realities of the situation presented by the record" and "evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers." *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998).

In the case at hand, there was no evidence indicating that Defendant possessed a gun at the time. Ms. Unger indicated that she had been "pistol whipped" by Mr. Washington at some time in the past, but there was no indication that Defendant was carrying a gun with him in the car, that he was known to carry a gun, or that she recently saw him with a gun. *See United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004) (finding exigent circumstances where officers observed suspect run into apartment with a firearm); *Wicks*, 995 F.2d at 969 (finding exigent circumstances where DEA informant observed guns in motel room). Additionally, the fact that Mr. Washington may have been a violent person in the past is not sufficient to justify the warrantless entry. For exigent circumstances to apply, law enforcement should demonstrate a reasonable belief that "immediate

12

action" is needed to protect their safety, or the safety of the public, and "there is no time to obtain a warrant." *Kempf*, 400 F.3d at 503.  At a minimum, law enforcement must have a reasonable belief that the situation might evolve in that direction. *United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002).  The Tenth Circuit rejected a blanket application of exigency to domestic dispute calls, which inherently put the police at risk due to the violent nature of the incidents and individuals. *Id*. Similarly, the fact Mr. Washington was known to have been a violent individual in the past is insufficient to establish the type of "clearly defined indications of exigency" that justify a warrantless intrusion. *United States v. Carr*, 939 F.2d 1442, 1448 (10th Cir. 1991).

Next, the government argues that a warrantless entry was necessary to prevent the destruction of evidence. (Doc. 94 at 5–6.)  While it is true that Mr. Washington and Mr. Martin did attempt to destroy evidence, the Court does not find this argument persuasive, as "[a] factor that develops post-seizure cannot be used to justify exigency." *Reeves*, 524 F.3d at 1170.  Furthermore, there is no evidence to indicate that the agents believed Mr. Washington was in possession of a large quantity of drugs for distribution like the defendant in *Wicks*, 995 F.2d at 969, or that Mr. Washington was in the process of destroying the drugs as in *Carr*, 939 F.2d at 1447, where the officer "heard a lot of commotion, shuffling and movement inside the motel room" and the "toilet flushing."

Indeed, the record indicates that, at most, Mr. Washington was suspected of carrying a small "dummy load" of marijuana.  Agent Contreras testified that when two cars are found traveling in tandem, as in the case at hand, one of the cars is generally used as a scout or to carry a small "dummy load," and the other car, usually the trailing car, carries the primary load of drugs. (Tr. 44–45.)  In the case of the "dummy load," the first car carries a very small amount of marijuana through the checkpoint so that when the car with the primary load passes through, the agents are

13

busy searching the other vehicle. (Tr. 45.)  Accordingly, at most, the agents hoped to find Mr. Washington with a "personal use" amount of marijuana, which apparently was the case. Furthermore, when Agent Gutierrez ran his dog through the parking lot of the motel, he did not alert, indicating the absence of a large quantity of drugs in the area. (Tr. 74.)

In sum, while the agents may have reasonably believed that Mr. Washington was in possession of a small, "personal use" amount of marijuana, it was obvious the primary load had been transported in Ms. Unger's Sebring.  The agents were not looking to arrest Mr. Washington for possession of a small quantity of marijuana, but rather for possession with intent to distribute on the large load that had been seized from Ms. Unger's vehicle.  So, there does not appear to have existed a serious threat of destruction of any crucial evidence linking Mr. Washington to the target offense. Additionally, possession of a small amount of "personal use" marijuana is a relatively minor offense, and entering the motel room and violating the Fourth Amendment to prevent the destruction of this evidence was not justified. *See Carr*, 939 F.2d at 1448 ("An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home . . . should be . . . available only for serious crimes . . . .").

Furthermore, with regard to the cell phone to which Ms. Unger texted, "goin to jail. I got this," that was later found damaged and hidden in the motel room, the government's concerns that the messages could be erased also lack the "compelling indications of exigency" that are required for a warrantless entry. *Wicks*, 995 F.2d at 971.  Agent Contreras indicated that he was very concerned about finding the phone because, once the text message from Ms. Unger was deleted from the phone, it would no longer be retrievable through the phone company. (Tr. 46.) Nonetheless, the agents were already in possession of Ms. Unger's phone, which provided the text message and the phone number to which the text was sent. (Tr. 57–58.)  Presumably, this information would have

14

been sufficient to connect Mr. Washington with the phone and the smuggling activities, even if the text message had already been erased.  There is nothing on the record that suggests Mr. Washington had the ability to so destroy the telephone inside the motel room that officers would not be able to determine that it was the cell phone to which the message had been sent.  Accordingly, the argument that the message could be erased appears to be a red herring.

Additionally, the government asserts that the agents feared Mr. Washington might flee the motel and that this further justified the warrantless entry.  Mr. Washington was likely to leave the motel in a short period of time: checkout was at 11:00 a.m. in the morning.  And knowledge that a suspect "might be planning to flee soon in a car on the open highway, coupled with an awareness that he sometimes was armed," in several cases, "have formed the basis for previous findings of exigency." *Wicks*, 995 F.2d at 971.  In the case at hand, however, there was little evidence to suggest Mr. Washington had a firearm, and the threat of an armed confrontation in a public space was unlikely. *See id.* at 969 ("it would be safer and also more efficacious and easier for the arrest to be done inside the motel room than outside in the parking place" given that "the field of fire is safer with respect to the public for an arrest in a room").  In fact, Agent Mechem, who made initial contact with Mr. Washington at the motel, gave no indication that he was concerned about an armed confrontation.[2]  Furthermore, the agents had the place under surveillance, it was located in a fairly remote area, it was early in the morning, and there were few people around.  Accordingly, even if

---

2.  The Court finds it notable that Agent Mechem never mentioned any serious concerns for safety or destruction of evidence during his testimony.  Like probable cause, it would seem that exigent circumstances must be based "upon the reasonable conclusions to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  In addition to destruction of evidence, one of the primary justifications for the exigent circumstances exception to the Fourth Amendment's warrant requirement is that officers believed "their own lives or the lives of others are at risk." *Wicks*, 995 F.2d at 970.  Yet, the record does not indicate that Agent Mechem was informed by Agent Contreras that Mr. Washington posed a danger or that he approached the encounter with this information in mind.  Accordingly, it appears that, from the perspective of the arresting officer, whose life the exception is designed to protect, the threat of an armed confrontation was not a paramount concern.

15

Mr. Washington attempted to flee, there was little threat that the agents would loose him or that he would injure someone.

Lastly, the Court notes that the agents in the case at hand never attempted to obtain a warrant. (Tr. 62.)  In *Wicks*, 995 F.2d at 971 n. 5, the Tenth Circuit stated that "our previous cases involving exigent circumstances have emphasized that the police began the process of obtaining a warrant as soon as they had probable cause," and that the agents "began warrant proceedings as soon as Wicks had been arrested and the motel room secured." (internal quotations omitted).  The testimony in this case indicates that one of the reasons the agents decided to forego the warrant requirement, even after the suspects and the motel room were secured, was because it would have taken several hours to obtain a warrant. (Tr. 51–52.)  Expediency, however, is not an acceptable reason to forego the requirements of the Fourth Amendment's warrant clause.

### C.  Receipt Seized from Defendant Inadmissible as Fruit of the Poisonous Tree

As the Court has determined that the arrest constituted a violation of the Fourth Amendment not subject to the exigent circumstances exception, any evidence seized from Defendant's person or the motel room as part of the search incident to arrest must be suppressed as fruit of the poisonous tree.  "In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person," the U.S. Supreme Court has held "that evidence seized during an unlawful search could not constitute proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

The government argues nonetheless that, even if the Court finds the arrest was unlawful, any evidence seized during the search should be admitted pursuant to the inevitable discovery doctrine: "If the agents did not have probable cause to arrest the defendant at the time that they originally made contact him [sic], they certainly had the probable cause once Ms. Unger added her statement

16

regarding his involvement to all of the other facts already known to the agents." (Doc. 71 at 11–12.) Accordingly, the government asserts that under the inevitable discovery doctrine, "the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means." *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000). Furthermore, the government argues that the Tenth Circuit has held that the "inevitability of the discovery of evidence creating probable cause to arrest [the defendant] renders [the defendant's] arrest valid." *United States v. Morse*, 15 Fed. App'x 590, 597 (10th Cir. 2001) (unpublished).

Nonetheless, *Morse* can be distinguished from the case at hand because the arrest in that case occurred on a public highway where officers only needed probable cause to seize the defendant. *United States v. Watson*, 423 U.S. 411, 423–24 (1976). Additionally, in *Morse*, at the time Defendant was arrested, there was no doubt that the evidence would be obtained by lawful means. *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982) ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is no doubt that the police would have lawfully discovered the evidence later."). Mr. Morse had already consented to a search of the toolbox where the contraband was discovered, and a drug-sniffing canine alerted to the toolbox just minutes after his arrest; therefore, even though the arrest was somewhat premature, the discovery of the drugs giving rise to probable cause to arrest was "inevitable." *Morse*, 15 Fed. App'x at 597. The same cannot be said in the case at hand.

"Inevitable discovery analysis [] requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." *Souza*, 223 F.3d at 1205. In the case at hand, there are three ways the government could have lawfully obtained the receipt that was seized from Defendant during the inventory search

17

performed at the Las Cruces DEA Office: (1) the agents obtained a valid arrest warrant and conducted a lawful search incident to arrest; (2) the agents had probable cause plus exigent circumstances to enter the motel room and arrest Mr. Washington; or (3) Mr. Washington exited the motel room voluntarily, and the agents arrested him.  It is the government that has the burden to "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984).  The government has failed to meet its burden.

There is absolutely no indication that Border Patrol agents were seeking an arrest warrant for Mr. Washington at the time the agents seized him in his motel room. *Souza*, 223 F.3d at 1204 ("The key issues in these cases, one of probability, is how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.").  Under Tenth Circuit precedent, "a court may apply the inevitable discovery doctrine only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." *Id*. at 1205.  While the Court agrees that the agents had enough evidence for probable cause at the time of the seizure, the government failed to show that the agents ever intended to apply for a warrant.  Accordingly, the Court cannot identify any contingency under which the receipt would have been discovered through lawful means.

Finally, the Court concludes that the receipt is not admissible as abandoned property. "[A]n abandonment must be voluntary, and the abandonment that results from a Fourth Amendment violation cannot be voluntary." *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 2005).  The receipts that Defendant took from his pocket at the Las Cruces DEA Office and placed in the trash cannot be considered abandoned property because the abandonment only occurred as a result of the previous unlawful seizure.

18

G.      **Cell Phone Is Admissible**

In the case of the cell phone seized from underneath the motel room sink, however, the Court concludes that this evidence is admissible under several theories.  First, the second search of the motel room was not an invasion of Defendant's right to privacy because it was not conducted until 1:00 p.m., after his rental period for the motel room had expired.  The Tenth Circuit has concluded that "[w]hen the rental period has elapsed, the guest has completely lost his right to use the room and any privacy associated with it." *United States v. Croft*, 429 F.2d 884, 887 (10th Cir. 1970).  At this point, the motel manager may enter the room or rent it to others, indicating that the previous occupant no longer has any right to privacy in the room or any belongings remaining in the room; and "[s]ince after the rental period expires a guest has no right of privacy, there can be no invasion thereof." *Id*.  Defendant clearly abandoned the phone under the sink, smashing the screen and making it unusable, and he apparently intended that it remain there after his rental period for the room expired; therefore, at the time the agents searched the room a second time and encountered the cell phone, Defendant no longer had an expectation of privacy in the premises or the phone. *Id*.; *United States v. Denny*, 441 F.3d 1220, 1227–28 (10th Cir. 2006) (concluding that when an individual abandons an object, he or she relinquishes any expectation of privacy in that object).

Next, the fact that the cell phone was not discovered until a second search of the motel room was performed more than eight hours after the unlawful arrest helps remove the taint of the initial unlawful seizure. *See Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).  The purpose of the exclusionary rule is to deter unlawful behavior by law enforcement.  Suppressing the evidence seized by the Border Patrol agents during the search subsequent to Defendant's arrest clearly accomplishes that goal.  It is not clear that suppression of the cell phone, however, would have the same deterrent effect.  The cell phone was not discovered as a result of the agents' unlawful

19

behavior, but from a secondary search that was initiated based on GPS coordinates that had been obtained by the police and led them to the room.  Accordingly, the cell phone was obtained through independent means unrelated to the initial constitutional violation, and under the independent source doctrine, it is admissible. *Nix*, 467 U.S. at 443.  The prosecution should not be put in a worse position with regard to this evidence simply because of the earlier incident of police misconduct, but this is what would occur if the cell phone were excluded: "When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Id*.  Accordingly, the Court concludes the cell phone is admissible.

## IV.    CONCLUSION

Defendant Mario Washington argues that his seizure, arrest, and custodial interrogation by law enforcement officers for suspicion of drug smuggling on August 24, 2010 was unlawful and violated the Fourth and Fifth Amendments of the United States Constitution.  Accordingly, Mr. Washington requests that the Court suppress any statements made by Defendant to law enforcement officers, any evidence seized from the motel room, including a cell phone that was found under the sink in the motel room during a later search, any evidence seized from Defendant's automobile, and any evidence seized from Defendant's person as a result of the unlawful arrest.

The Court concludes that Defendant's seizure was unlawful and not justified under the exigent circumstances exception to the Fourth Amendment's warrant requirement.  Therefore, the Court grants Defendant's request to suppress the Walmart receipt and any other evidence seized during the search of Defendant's motel room and person subsequent to his arrest.

The Court, however, denies Defendant's request that it suppress the cell phone, as it was no longer subject to an expectation of privacy at the time of the seizure and was discovered through

20

independent means.

The Court denies as moot Defendant's request to suppress evidence seized from the Dodge Charger because the government does not seek to admit any evidence seized from the automobile.

And finally, the Court denies as moot Defendant's request to suppress his statements because the government does not seek to admit the statements at trial.

**WHEREFORE**,

**IT IS HEREBY ORDERED** that Defendant Mario Washington's Motion to Suppress Evidence (Doc. 44) is **DENIED IN PART** and **GRANTED IN PART**.

_____/s/ Michael J. Reagan_____
**MICHAEL J. REAGAN**
**UNITED STATES DISTRICT JUDGE**

21