# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. CR 10-3160 RB |
| ) | |
| ) | |
| MARIO DEVONNE WASHINGTON, SR., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on the United States' Sentencing Memorandum and Motion for Upward Variance (Doc. 149, filed July 18, 2011), and Defendant Washington's Objections to Pre-Sentence Report, Response to the United States Sentencing Memorandum and Motion for Upward Departure, and Request for Downward Departure. (Doc. 151, filed December 15, 2011). Having considered the arguments and submissions of counsel, relevant law, and being otherwise fully advised, the Court **DENIES** the Government's Motion for Upward Variance, **DENIES** Defendant's Request for Downward Departure, and **SUSTAINS** Defendant's Objections to the Pre-Sentence Report.

## I.    Background

On August 24, 2010, a United States Border Patrol agent patrolling New Mexico State Highway 26 near Hatch, New Mexico, observed two vehicles – a 2007 Dodge Charger and a 2006 Chrysler Sebring, with Iowa and Texas license plates, respectively – traveling in tandem. (Pre-sentence Report [PSR] at 4, ¶ 10). The agent began following the vehicles and noticed that they "began driving erratically, slowing down and then increasing speed, as if they wanted the agent to

pass them." (Id.) The agent followed the vehicles through Hatch, New Mexico. (Id.) Once on Interstate 25, the Dodge Charger "sped off" and left the Sebring behind. (Id.) The agent stopped the Sebring and made contact with the driver and sole occupant, Alicia Unger. (Id.) According to the Government, the agent requested and received consent from Unger to inspect the vehicle with a canine. (Id.) The canine alerted to the trunk compartment of the vehicle, further inspection of which revealed 19 kilograms of marijuana. (Id.) Agents subsequently alerted other law enforcement officers to be on the lookout for the Dodge Charger. (PSR at 4, ¶ 12).

After being advised of her rights, Unger identified the Dodge's occupants as Defendant Mario Devonne Washington and Michael Martin, both from Galesburg, Illinois. (PSR at 4, ¶ 13). Unger admitted to driving in tandem with the Dodge and told officials that the group was transporting marijuana. (PSR at 4, ¶ 13).

Border Patrol agents in Truth or Consequences, New Mexico, located the Dodge Charger at a motel and subsequently made contact with Washington and Martin in their motel room. (PSR at 4-5, ¶ 14). The agents transported both men to the Drug Enforcement Agency office in Las Cruces, New Mexico, for further questioning. (Id.) A search of the motel room revealed a cellular telephone which was later determined to have been in contact with a phone found on Ms. Unger's person at the time of the border patrol stop. (PSR at 5, ¶¶ 13-14). Defendant Washington was later charged with knowingly possessing and conspiring to possess marijuana with intent to distribute.

On March 15, 2011, Washington pled guilty to conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(D). The maximum term of imprisonment for this offense is ten years. (PSR at 7, ¶ 29; 21 U.S.C. § 841(b)(1)(D)). Defendant has prior drug convictions which render him eligible for the statutory maximum of ten years

2

imprisonment.  21 U.S.C. § 841(b)(1)(D).

Defendant's guilty plea to conspiracy to possess with intent to distribute 19 kilograms of marijuana corresponds to a base level of 16.  U.S.S.G. § 2D1.1(c)(12).  The PSR calculated a two level increase for obstruction of justice in connection with the investigation or prosecution of the offense, as well as a two level increase for his role in the instant offense as that of an organizer or leader of the drug smuggling scheme.  (PSR at 6-7, ¶¶ 23, 26).  Based on these adjustments, Washington's offense level was 20.  (PSR at 7, ¶ 28.  However, because (1) Washington was at least 18 years old at the time of the instant offense, (2) the instant offense is a qualifying felony offense, and (3) he has at least two prior qualifying felony convictions, Washington meets the criteria for a career offender.  (PSR at 7, ¶ 29; U.S.S.G. § 4B1.1(a)).  Pursuant to U.S.S.G. § 4B1.1, a determination that a defendant is a career criminal may result in additional adjustments.  If the offense level for a career offender listed in the table provided in that subsection is *greater* than the offense level otherwise applicable (here, "20"), the offense level from the table shall apply. U.S.S.G. § 4B1.1(b).  For an offense with a statutory maximum of 10 years or more, but less than 15 years, as is the case here, the corresponding offense level is 24.  *Id.*  Thus, Washington's offense level rose from 20 to 24.  Following this computation, Washington received a two level reduction for demonstrating an acceptance of responsibility for the offense of conviction.  (PSR at 7, ¶ 30; U.S.S.G. § 3E1.1).  Thus, the PSR calculated a final offense level of 22.

Pursuant to U.S.S.G. § 4B1.1(b), a career offender's criminal history category in every case falling within that subsection is Category VI.  Washington's criminal history category must therefore be adjusted to Category VI.  U.S.S.G. § 4B1.1(b); PSR at 12,  ¶ 44.  The resulting guidelines imprisonment range is 84-105 months, which is advisory only. *United States v. Booker*, 543 U.S.

220, 245 (2005).

On July 18, 2011, the United States filed a Sentencing Memorandum and Motion for Upward Variance, asking the Court to vary upward and sentence Washington to the maximum 120 months imprisonment. The Government argues that a guideline sentence of 84 to 105 months would not adequately account for the broad scope of Washington's criminal activity conducted both before his most recent arrest and since being in custody. (Doc. 149 at 9). The government specifically points to evidence suggesting that since being incarcerated, Washington has attempted to direct further marijuana shipments and to solicit the murder of his co-defendant, Alicia Unger.

The defense filed its Objections to the Pre-Sentence Report, Response to the United States Sentencing Memorandum and Motion for Upward Departure, and Request for Downward Departure on December 15, 2011. (Doc. 151). Therein, Washington argues that the PSR's application of enhancements for an "aggravated role" and "obstruction of justice" are based on facts which Washington has never admitted. Washington further asserts that the United States, in requesting an upward departure, relies on conduct which was not part of the charged offense, which he has not admitted, and which would result in a sentence higher than what he would receive under the guidelines with career offender status. Washington contends that the Court's consideration of his objections require fact-finding on several disputed issues, and urges the Court to apply a heightened standard of proof in determining whether to accept these facts as true for sentencing purposes.

An evidentiary hearing was held in this matter on February 22, 2012, and the matter is now ready for decision.

## III.   Discussion

United States Code Section 18 U.S.C. § 3553(a) instructs courts to impose sentences that are

4

sufficient, but no greater than necessary, to accomplish the purposes set forth in § 3553(a)(2). Section 3553(a)(2) provides that a sentence must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In determining the particular sentence to be imposed, the Court must also take into account the nature and circumstances of the offense, as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).

     *1.     United States' Motion for Upward Variance*

The Government asserts two primary bases for imposition of an upward variance: (1) the instant offense represents only a small portion of Washington's criminal activity; and (2) a sentence of 120 months is necessary to protect the public, and more particularly, to protect Alicia Unger, Charisma Thomas, and Bobby Thomas, from future crimes at Washington's hands.

In support of its first argument, the Government points to evidence provided by Charisma Thomas, Washington's former girlfriend and the mother of one of his children. A few months after Washington's arrest, Ms. Thomas contacted authorities in Illinois and relayed specific knowledge regarding previous trafficking operations led by Washington. According to the Government, her description of Washington's general method of transporting drugs – driving two cars in tandem, one containing drugs and the other transporting Washington himself – was wholly consistent with the facts of the instant case. She described making approximately ten trips with Washington to pick up and deliver drugs around the country, including trips to Arizona, Texas, and Colorado. In addition, she provided several letters sent to her by Washington during his incarceration, one of which

appeared to organize a marijuana shipment from behind bars.  The Government acknowledges that this letter never specifically mentions marijuana or any other drugs by name.  However, it states that during Ms. Thomas' meeting with Illinois authorities, she explained the significance of the coded terms and unambiguously interpreted the letter to direct the transport of marijuana.

In support of its second argument regarding the need to protect the public from future crime, the Government again cites to the letters provided by Ms. Thomas and argues that these letters contain both coded instructions to murder his co-defendant, Alicia Unger, and outright threats to the safety of Ms. Thomas and her brother, Bobby Thomas.  In the letter allegedly soliciting the murder of Ms. Unger, dated October 26, 2010, which Washington sent to Ms. Thomas but addressed to an unknown individual named "Will," Washington instructs "Will" to "get with Biz or free style a C.D. by your self [sic] . . . . That ni**a who got me and cuz in this bogus production situation is on deck down . . . . If you spooked and can't do it call biz and tell him I need him to do that C.D." (Doc. 124 Ex. 3).  According to the Government, Ms. Thomas immediately recognized that the purpose of this letter was to solicit the murder of Ms. Unger.

Washington also sent a letter to Ms. Thomas dated November 15, 2010, addressed to "Mrs. Bobby Thomas," Charisma's brother.  Ms. Thomas stated that Washington addressed it to "Mrs." Bobby Thomas in order to convey his dislike for Bobby.  In this letter, Washington accuses Bobby of "talking s**t" at his family's home and of engaging in incestual relations with this sister, Charisma.  He states that "I beat your sister because I was tired of you trying to f**k her," and that the two of them would "run into each other sooner than you think girl!"  (Doc. 124 Ex. 5).  In a postscript, Washington also instructs Bobby to "[t]ell Charisma she got a ass whoppin coming about [his] $250.00!"

Finally, in a letter dated November 16, 2010, Washington first instructs Ms. Thomas to give his family the key to his Suburban, and then accuses her of engaging in incestual relations with her brother. (Doc. 124 Ex. 6). Washington further accuses Ms. Thomas of "playing with [his] daughter," and tells her "[i]t won't be long before [she] see[s] the black asassin [sic] or the black mafia[,] you can run but you can't hide!" (Doc. 124 Ex. 6). Washington additionally references knowledge of Ms. Thomas' movements, stating, "[w]hen you, your mom and [Bobby] was at the store in that Park ave [sic] buying tall cans my Mexicans could of got at ya'll then! They been watching you! You will soon to see about playing with the mafia!" (Id.) He instructs that if she "want[s] to stop the war [she] better let [him] see [his] daughter and give [him] his [suburban] key." In a postscript, he tells her: "you can change your cell number[,] you think that's going to save you! I will be at your door! Wherever you at! You playing with my daughter I have no choice!" (Id.)

Based on these letters, containing both direct and allegedly coded threats to the safety and security of others, the Government argues that a sentence of 120 months imprisonment is necessary to protect the public from the defendant. In response, the defense argues that the Government bases its motion on conduct that Washington has never admitted, has never been charged for, and ultimately disputes. At the evidentiary hearing held in this matter, the defense offered a variety of alternative interpretations for Defendant's words, highlighting that the testifying agent's (Agent Gimler's) reading of the letters stemmed solely from Ms. Thomas' own interpretation. The defense additionally suggested Ms. Thomas may have had a motive for manufacturing or exaggerating the import of Washington's letters; she and the defendant have a highly contentious relationship, and she may have harbored a desire for him to remain incarcerated. The defense further submits that Ms. Thomas was angry with Washington because she had recently discovered Washington had children

7

with another woman.

The defense urges the Court, in making its factual findings for sentencing purposes, to apply a heightened standard of proof to the disputed conduct. Although the defense acknowledges that U.S. Sentencing Guideline §6A1.3 sets forth a preponderance standard for disputed facts, it contends that the Tenth Circuit has left often the possibility that a dramatic increase in sentencing may warrant a heavier burden of proof. (Doc. 151 at 6) (citing *United States v. Leifson*, 568 F.3d 1215 (10th Cir. 2009), and *United States v. Olsen*, 519 F.3d 1096 (10th Cir. 2008)).

In this case, it is unnecessary to decide the question whether to apply a heightened standard because the relevant conduct alleged by the Government cannot be established by even a preponderance of the evidence. While certain of Washington's threats are unambiguous, the letters allegedly organizing a drug transport and soliciting the murder of Ms. Unger were largely written in slang and code which this Court is unable to decipher based on plain meaning. The interpretation offered by the Government stems directly and entirely from Charisma Thomas, who arguably has a motive to exaggerate, comes via multiple layers of hearsay[1], and lacks any independent corroboration. At the evidentiary hearing, Agent Gimler was careful to frame his testimony as being based on Ms. Thomas' statements rather than on his independent knowledge and experience. The Government offered no evidence supporting her interpretation. Given these circumstances, the Court finds that the language relied on by the Government in its motion for an upward variance is simply too tenuous to support the imposition of a substantially greater sentence than would

---

[1]The letters were written by Washington and interpreted by Charisma Thomas. Ms. Thomas relayed her interpretation in an interview with a law enforcement officer in Illinois. This interview was recorded and later viewed by Agent Gimler, who testified to the letters' meaning at the evidentiary hearing held on February 22, 2012.

otherwise be applied under the guidelines. While the direct threats against Ms. Thomas and her brother Bobby may support a high-end guideline sentence, the Court will not use them as a basis to grant the United States' request. Thus, the Government's request is denied.

       2.       *Defense Motion for Downward Departure*

In his Request for Downward Departure, Washington asked the Court to determine whether, given Washington's criminal history and aggregate total days of incarceration, he should be considered a "career offender" within the meaning of the Sentencing Guidelines. However, at the evidentiary hearing held in this matter, the Court determined that defense counsel miscalculated Washington's aggregate total days in custody. Based on the Court's discussion with defense counsel and its review of Washington's criminal history as set forth in the PSR, the Court finds that Washington meets the definition for career offender. Washington's request for a downward departure is denied.

       3.       *Defense Objections to Pre-Sentence Report*

The Court sustains Washington's objections to the PSR for the reasons discussed in sub-section (1) above. Based on the current record, and for purposes of sentencing the Defendant, the Court will not find that (1) Washington solicited to have Alicia Unger killed (PSR ¶¶ 16, 23); (2) Washington was the organizer/leader of the drug smuggling scheme (PSR ¶ 26); (3) Washington organized marijuana-transport trips which he took with Charisma Thomas (PSR ¶ 26); or (4) Washington is a member of the gang "Black Gangster Disciples." (PSR ¶ 52).

       4.       *Sentencing*

The Court finds that a sentence of 105 months would be sufficient, but no greater than necessary, to accomplish the purposes of § 3553(a). Because the career offender provision controls

Washington's offense level and his criminal history category, Washington's offense level is 24 even without the determination that he obstructed justice or was an organizer/leader of the marijuana distribution.  Application of a two level reduction for demonstrating acceptance of responsibility corresponds to a final offense level of 22.  Again, given his status as a career offender, Washington's criminal history category is automatically Category VI.  The resulting guidelines imprisonment range is therefore 84 - 105 months.

Although this range is advisory only, *United States v. Booker*, 543 U.S. 220, 245 (2005), the Court finds that 105 months imprisonment is appropriate under the circumstances.  Given Defendant's significant criminal history, lack of any verifiable employment, and repeated violations of United States' narcotics laws, a high-end guideline range reflects the seriousness of his offense, promotes respect for the law, and provides just punishment for the crime.  Further, a sentence of 105 months is significantly greater than any sentence Defendant has served in the past and will serve as an adequate deterrent of future criminal conduct.  The Court also finds that this sentence is warranted to protect the public from further crimes of the defendant.  Although the Court was unable to find that Washington solicited the murder of Alicia Unger by a preponderance of the evidence, his letters reveal unambiguous threats to the security of Charisma Thomas and her brother Bobby.

   **WHEREFORE,**

   **IT IS ORDERED** that the United States' Motion for Upward Variance (Doc. 149) is **DENIED.**

   **IT IS FURTHER ORDERED** that Defendant's Request for Downward Departure (Doc. 151) is **DENIED**.

   **IT IS FURTHER ORDERED** that Defendant's Objections to Pre-Sentence Report (Doc.

151) are **SUSTAINED** for sentencing purposes.

   **IT IS FURTHER ORDERED** that the sentencing hearing will reconvene on Wednesday, February 29, 2012, wherein Defendant Mario Devonne Washington will be sentenced to imprisonment for a period of 105 months.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

11